AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Texas

| | |
|---|---|
| United States of America<br>v.<br>Felix Amos and<br>Oluyemisi Amos<br><br>*Defendant(s)* | Case No.<br><br>H17-0359M |

United States Courts
Southern District of Texas
FILED

MAR 17 2017

David J. Bradley, Clerk of Court

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __2/2/2011 through 4/6/2015__ in the county of __Harris__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. Section 1347 | Health Care Fraud |
| Title 18 U.S.C. Section 1349 | Conspiracy to Commit Health Care Fraud |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Jeffrey S. Hochadel, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: __March 17, 2017__

_____
Judge's signature

City and state: __Houston, Texas__        USMJ Stephen Wm Smith
Printed name and title

# AFFIDAVIT

## A. IDENTITY AND EXPERIENCE OF AFFIANT

I, Jeffrey S. Hochadel, your affiant, being duly sworn, do depose and state as follows:

1. Affiant has been a Special Agent with the U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigations ("DHHS-OIG") for approximately 15 years. Affiant is assigned to the Houston Field Office of the DHHS-OIG.

## B. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a complaint and arrest warrant for FELIX AMOS ("FELIX") and OLUYEMISI AMOS ("OLUYEMISI").

3. This affidavit does not contain all information gathered during this investigation, but is being submitted for the limited purpose to establish probable cause to believe that the individuals below have engaged in and continue to engage in criminal activity.

4. Based on my investigation and the information contained in this affidavit, it is affiant's belief that FELIX and OLUYEMISI, have engaged in violation of federal law, including violations of Title 18, United States Code, Section 1347 (health care fraud), and 1349 (conspiracy to commit health care fraud).

## C. BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

5. The information contained in this affidavit is a compilation of information developed through investigations by the United States Secret Service ("USSS"), the Internal Revenue Service ("IRS"), the Texas Attorney General's Office-Medicaid Fraud Control Unit ("MFCU"), and affiant's direct personal knowledge through review of the evidence and interviewing witnesses believed to be credible and to possess accurate information.

## D. FEDERAL HEALTH CARE FRAUD

1

6. Based on affiant's training and experience, as well as work on other health care fraud cases, affiant knows the following regarding health care fraud:

7. Medicare is a federally funded health insurance program designed to provide medical care to individuals over age 65 and individuals with disabilities. The Medicare payment system comprises three divisions: Medicare Part A (hospital insurance), Medicare Part B (medical insurance), and Medicare Part D (prescription drug benefit). Medicare Part A helps pay for inpatient hospital stays, skilled nursing facility services, home health services and hospice care. Medicare Part B helps pay for physician services, outpatient hospital services, medical equipment and supplies, ambulance transportation services and other health care services and supplies. Medicare Part D helps pay the costs of prescription drugs and prescription drug insurance premiums for Medicare beneficiaries.

8. Medicare assigned a National Provider Identifier (NPI) to providers. The NPI is a unique 10-digit identification number issued to enrolled health care providers for use in the submission of claims for payment under Medicare.

9. The Medicare Enrollment Application contains an Electronic Data Exchange (EDI) agreement and Medicare EFT Authorization Agreement. The EDI is used to submit claims billing information, encounter information, or both. Medicare sends payments directly to the financial institution identified in a provider's EFT application.

10. To be eligible for home health care, the referring physician must have a face-to-face encounter with the patient no more than 90 days prior to the home health start of care date. Form CMS-485 "Home Health Certification and Plan of Care" is completed by the referring physician. The physician signs the form and can bill Medicare for the physician office visit under Medicare Part B.

E. **STATEMENT OF PROBABLE CAUSE**

11. FELIX and OLUYEMISI are married. They live together and owned several businesses together.

12. On February 20, 2015, OLUYEMISI became the registered agent and director for Guarranty Home Health Agency, Inc. ("GUARRANTY HOME HEALTH"). GUARRANTY HOME HEALTH billed Medicare for services rendered from March 6, 2014 through January 6, 2015. GUARRANTY HOME HEALTH billed Medicare for these services from February 18, 2015 through April 6, 2015. From February 26, 2015 through April 2, 2015, Medicare paid GUARRANTY HOME HEALTH approximately $2,739,436.87 into GUARRANTY HOME HEALTH's J.P. Morgan Chase account ending in *9621 ("account *9621") for services rendered from March 6, 2014 through January 6, 2015.

13. OLUYEMISI received approximately $530,000.00 from GUARRANTY HOME HEALTH's account *9621. OLUYEMISI and FELIX also received indirectly approximately $259,435.69 from GUARRANTY HOME HEALTH's account *9621. GUARRANTY HOME HEALTH's account *9621 sent approximately $189,000 to another business owned or controlled by OLUYEMISI and FELIX.

14. Dr. A.W., Dr. D.P., and Dr. V.B. were some of the referring physicians for the beneficiaries GUARRANTY HOME HEALTH billed Medicare for services rendered from March 6, 2014 through January 6, 2015. Medicare paid GUARRANTY HOME HEALTH for these services. GUARRANTY HOME HEALTH claims to Medicare show that these physicians allegedly certified home health services for approximately 99% of the claims submitted by GUARRANTY HOME HEALTH for services rendered from

March 6, 2014 through January 6, 2015. Investigators talked with each of these physicians and each stated they had never heard of GUARRANTY HOME HEALTH and they had not referred or certified any patients for home health services to GUARRANTY HOME HEALTH.

15. A.G., C.M., G.A., M.C., T.T., B.M., G.J., M.P., and S.B. were beneficiaries that GUARRANTY HOME HEALTH submitted claims to Medicare for services rendered from March 6, 2014 through January 6, 2015. According to claims submitted by GUARRANTY HOME HEALTH to Medicare Dr. A.W., Dr. D.P., or Dr. V.B. referred these beneficiaries to GUARRANTY HOME HEALTH. Investigators talked to all of these beneficiaries and each stated that they never received home health services from GUARRANTY HOME HEALTH and that they never heard of the listed referring physician.

16. On March 28, 2014, OLUYEMISI purchased Access Practical Solutions, Inc. DBA Access Home Health ("ACCESS"). The Medicare enrollment application for ACCESS identifies OLUYEMISI as the owner with 100% interest.

17. On April 29, 2014, the Electronic Funds Transfer (EFT) was changed to designate Medicare payments for ACCESS to be deposited into a Bank of America account ending in *9239 ("account *9239"). Oluyemisi Okedokun (AKA OLUYEMISI) owned account *9239.

18. From August 21, 2014, through December 9, 2014, Medicare paid ACCESS approximately $7,308,527.76 for services billed by ACCESS. ACCESS billed for services rendered from July 31, 2013 through September 28, 2014. ACCESS' account *9239 transferred approximately $5,630,000.00 into accounts owned or controlled by

OLUYEMISI and FELIX.

19. Dr. A.W., Dr. S.G., Dr. B.L., and Dr. R.N. were some of the referring physicians for beneficiaries ACCESS billed Medicare for services rendered from July 31, 2013 through September 28, 2014. Medicare paid ACCESS for these services. ACCESS claims to Medicare show that these physicians allegedly certified home health services for approximately 76% of the claims submitted by ACCESS for services rendered from July 31, 2013 through September 28, 2014. Investigators talked with Dr. A.W., Dr. S.G., and Dr. B.L. and each of these physicians stated they had never heard of ACCESS and they had not referred or certified any patients for home health services to ACCESS. On April 13, 2012, Dr. R.N. voluntarily surrendered his medical license. ACCESS was using Dr. R.N.'s name for services rendered to beneficiaries after he voluntarily surrendered his medical license.

20. E.B., and P.L. were beneficiaries that ACCESS submitted claims to Medicare for services rendered between July 31, 2013 through September 28, 2014. According to claims submitted by ACCESS to Medicare Dr. A.W., or Dr. B.L. referred these beneficiaries to ACCESS. Investigators talked to both of these beneficiaries and each stated that they never received home health services from ACCESS and that they never heard of the listed certifying physicians.

21. On May 8, 2014, OLUYEMISI became the registered agent and President for GetUpAndWalk, Inc. (AKA Getupandwalk) ("GETUPANDWALK"). From May 2, 2014 through September 12, 2014, Medicare paid GETUPANDWALK approximately $5,362,551.17 for services rendered from January 7, 2013 through June 27, 2014. Medicare deposited payments into GETUPANDWALK's Bank of America account

ending in *2871 ("account *2871").

22. GETUPANDWALK's account *2871 transferred approximately $4,449,000.00 into accounts owned or controlled by OLUYEMISI. GETUPANDWALK's account *2871 transferred approximately $483,000.00 into accounts owned or controlled by OLUYEMISI and FELIX.

23. Dr. A.W., Dr. S.G., Dr. B.L., and Dr. R.N. were some of the referring physicians for GETUPANDWALK for services billed and paid by Medicare for services rendered from January 7, 2013 through June 27, 2014. GETUPANDWALK claims to Medicare show that these physicians allegedly certified home health services for approximately 50% of the claims submitted by GETUPANDWALK for services rendered from January 7, 2013 through June 27, 2014. Investigators talked with Dr. A.W., Dr. S.G., and Dr. B.L. and each of these physicians stated they had never heard of GETUPANDWALK and they had not referred or certified any patients for home health services to GETUPANDWALK. On April 13, 2012, Dr. R.N. voluntarily surrendered his medical license. GETUPANDWALK was using Dr. R.N.'s name for services rendered to beneficiaries after he voluntarily surrendered his medical license.

24. Investigators talked to A.H., M.F., and J.W. about GETUPANDWALK. GETUPANDWALK billed for each of these beneficiaries for services rendered from January 7, 2013 through June 27, 2014. According to claims submitted by GETUPANDWALK to Medicare Dr. S.G. referred these beneficiaries to GETUPANDWALK. Each of these beneficiaries stated that they never received home health services from GETUPANDWALK and did not know the referring physician.

25. On February 2, 2011, FELIX and OLUYEMISI purchased the home health company

6

Advanced Holistic Healthcare Services Inc. (ADVANCED HOLISTIC) located in Houston, Texas.

26. On April 4, 2012, FELIX and OLUYEMISI submitted a change to the Medicare application (CMS 855A) showing a 50% ownership for FELIX and 50% for OLUYEMISI for ADVANCED HOLISTIC.

27. FELIX signed an Electronic Data Exchange (EDI) agreement and Medicare EFT Authorization Agreement for ADVANCED HOLISTIC.

28. OLUYEMISI established an EFT agreement with Medicare and provided their financial institution information as Comerica Bank, account number ending in *3291 ("account *3291").

29. On May 21, 2012, FELIX and OLUYEMISI filed Form 424 Certificate of Amendment with the Texas Secretary of State, changing the ownership of ADVANCED HOLISTIC to FELIX and OLUYEMISI.

30. ADVANCED HOLISTIC billed Medicare for services rendered from April 22, 2010 through October 15, 2012. The services ADVANCED HOLISTIC billed for were allegedly certified by Dr. S.G. according to claims submitted to Medicare. Medicare paid ADVANCED HOLISTIC $2,156,799.99 for these services.

31. Investigators talked with Dr. S.G. and he stated he had never heard of ADVANCED HOLISTIC nor referred or certified any patients for home health services to ADVANCED HOLISTIC.

32. Claims for home healthcare services were submitted to Medicare by ADVANCED HOLISTIC for services provided to patient A.H. The total claim amount submitted was $5,098.00. A review of Medicare Claims data for A.H. showed that the claims submitted by

ADVANCED HOLISTIC for services provided October 3, 2012, and August 4, 2012 were referred by Dr. S.G.

33. Medicare paid the October 3, 2012, and August 4, 2012, claims for A.H. via EFT to ADVANCE HOLISTIC's account *3291 on May 21, 2013.

34. On October 13, 2016, A.H. was interviewed and stated he did not know the business ADVANCED HOLISTIC and that he never received home health care services from ADVANCED HOLISTIC. He did not know Dr. S.G., OLUYEMISI, or FELIX.

35. On January 14, 2016, Dr. S.G. was interviewed and stated he was never a director for any home health companies nor did he sign any CMS-485's on behalf of ADVANCED HOLISTIC. Dr. S.G. was not familiar with ADVANCED HOLISTIC or its registered owners, OLUYEMISI or FELIX. Additionally, A.H. was not a patient of Dr. S.G. nor did Dr. S.G. refer A.H. for home health services.

## CONCLUSION

36. Based on the aforementioned facts, affiant states there is probable cause to believe, and does believe, that FELIX AMOS and OLUYEMISI AMOS have violated and attempted to violate, Title 18, United States Code, Section 1347 (health care fraud), and 1349 (conspiracy to commit health care fraud).

JEFFREY S. HOCHADEL,
Special Agent DHHS-OI-OIG

Sworn and subscribed before me, and I find probable cause, on this 17th day of March, 2017

UNITED STATES MAGISTRATE JUDGE

8